is Teets v. Great West Life, number 18-1019. It looks like everybody is ready. So, counsel, let's proceed. Please enter your appearance. Thank you, Your Honor. May it please the Court. Peter Stris on behalf of the appellant, John Teets. Great West's use of the annuity contract, in this case, violated ERISA in one of two ways. If, as we submit, Great West exercised control over the contract by setting quarterly interest rates, then it violated section 406B of ERISA, which categorically prohibits any fiduciary from dealing with a planned asset for its own account. On the other hand, if, as Great West submits, it only proposed quarterly interest rates, then Great West violated section 406A, unless Great West proves that the terms of its contract were reasonable. In granting summary judgment... I'm sorry to interrupt you so early in your argument, but when you say 406A, I assume you're relying here solely on 406A1D. Correct. And which part of A1D are you relying on? So, in a nutshell, you can't use planned assets for your benefit unless you fall within an exemption. So, the contract's the planned asset. No, I understand all that. I guess what I'm asking you is, as I recall, 406A1D says, it closes the introductory passage and says, indirect or direct, transferred to or used by or for the benefit of a party in interest of assets of the plan. So, are you relying on the transfer, the disjunctive transfer to, or are you relying on used by? Used by. The contract is being used by Great West for its benefit. It makes a profit. And in a nutshell, our argument is simple. You can't overcharge an ERISA plan for services. I couldn't enter into a contract with an ERISA plan for an 85 percent contingency because it would not be a reasonable contract for necessary services under Section 408B. So, I think we clearly trigger 406A1D because Great West admits the contract is a planned asset and it's being used so that Great West presumably can generate profits. That's the business that they're in. Well, do you agree or disagree with the premise that, the following premise, that the used by clause embeds within it the for use by or for the benefit of clause? In other words, is the disjunctive that you're relying on the used by Great West of the planned assets for the benefit of? So, you would agree with Mr. Phillips that under A1D it has to be for the benefit of Great West? I would. But I would say that any time you take an asset, including a non-monetary asset, like a chicken, if a plan had a chicken and I took the chicken and I took its eggs and I sold them, or it was a dancing chicken and I put it out there and people paid me to see the chicken, you'd be taking the planned asset and using it for your benefit. Any time you take a planned asset and you derive profits from its use, which happens often with a contract, you trigger 406A1D. And what I would point out, Your Honor, is this was not in dispute below. There was no dispute that 406A1D was triggered. In granting summary judgment on our party and interest non-fiduciary claim, the Court never got to the merits of — the Court never said A1D wasn't triggered. The Court never got to the merits of whether this was a reasonable contract for necessary services. Instead, it misread Harris Trust to convert a knowledge of the circumstances test into essentially knowledge of illegality. And that just cannot — that antecedent legal holding where he poured us out on summary judgment just can't be squared with the Solomon case. If the district court is right, then Justice Thomas' opinion in Solomon is wrong because Solomon was a non-fiduciary in that case. They sold property to the plan. It was alleged to be worthless. Solomon actually asserted an exemption, a class exemption, 75-1. And there was no mention in the case about, oh, did they know that they didn't qualify for the exemption? Should they have known? The entire discussion in the case was about whether they were aware of the circumstances. Well, but the quote from Solomon says, translate to the incident context, the transferee must have had actual constructive knowledge of the circumstances that rendered the transaction unlawful. Correct, Your Honor. So they've got to know it's unlawful. Well, they have to know the circumstances, which means they have to know they were dealing with a plan. They have to know how much they charged. They have to know how much risk they were bearing. But if they had advice from their lawyer that they satisfied an exemption, that would not get them out of this. We would still litigate the reasonableness of the contract. It's not a subjective, state-of-mind test for intent. But you would agree on this part of your claim, that the burden is on you to show that Great West either knew or should have known that it participated in the prohibited transaction and that the compensation was unreasonable. Is that burden on you? Would you agree with that? So the burden is on us through 502A3, because it has to be appropriate equitable relief, to show that Great West knew that it was dealing with a trust and it knew the circumstances that are the basis for us saying the compensation was unreasonable, how much they charged, how they were investing the money, all the things that the expert reports are filled with. Well, just kind of getting back to my burden question, we're here reviewing summary judgment. What did you need to do and did you do it to survive summary judgment based on this burden? So I think we certainly did. If you look at our expert reports and the extent of expert discovery, in detail it explains how much risk Great West was taking on, how they were investing the money, what their cost of capital was. All of these things go to the fight over whether the compensation was reasonable. It cannot be, I submit, Your Honor, that we have to prove that Great West knew that their legal position was wrong. That's essentially what the district court said. No defendant is going to admit that they knew they were violating the statute. And so the idea that there's constructive knowledge, you should have known that your compensation was unreasonable, that's no different than what we alleged all along, which is you knew the circumstances. Well, isn't the knowledge the knowledge of the planned fiduciary? I mean, that's what Solomon says. It says it's the knowledge of the planned fiduciary. So Great West has to know the planned fiduciary was acting despite knowledge that the transaction was. So just to be clear, there's two separate requirements. There's a knowledge requirement that is in the language of 406A itself. That applies to the fiduciary. The statute says the fiduciary has to have actual or constructive knowledge that it's doing a transaction that indirectly or directly, you know, our A1D position. There is nothing in A1D that talks about the knowledge of the party in interest. That comes from Solomon, and I think correctly so. Justice Thomas said, well, it's a 502A3 claim. And under 502A3, you can only bring a claim for appropriate equitable relief. And in premerger equity courts, you would get appropriate equitable relief from a transferee, which is what Great West is, if they knew the circumstances, if they knew they were dealing with a trust, if they knew that they received property that they shouldn't have. We clearly met our burden under that historical equity test. And we have extensive expert discovery, basically, that sets forth all the reasons why we believe this deal was fundamentally unfair. Well, let me probe that a little bit further, Mr. Stris. The passage that you're quoting from Justice Thomas and as Solomon Smith says, where he refers to the circumstances language that you're focusing on, he then, in the very next sentence, and I don't have it in front of me, but says the equivalent of that this requires knowledge of the elements of a 406A violation. Now, at least take that as an assumption. Now, as I understand it, Great West's argument is that on what you acknowledge, you bear the burden to show a prohibited transaction under 406A1D. You, just a few moments ago, acknowledged that under 406A1D, the use by clause embeds within it for the benefit of, and in a Reich, under Jordan, and probably just the plain reading of 406A1D, the Great West has argued that there has been no evidence presented to rebut summary judgment on the subjective intent of Great West to use or to invest these planned assets for the benefit of Great West. So, Your Honor, I think I understand that argument. I think it can't be right because it proves too much, and here's why. Either we're right that any time you take a planned asset, this is back to my chicken example, I apologize, it's a little frivolous, but either we're right that every time you take a planned asset and you use it and you derive profits from it, that triggers A1D, or we're wrong. If we're wrong, then using a planned asset to make profits would never be scrutinized for reasonableness under the statute. The whole point of the prohibited transaction rules, they were enacted, they're very broad and they're very aggressive. If you look at the way they work, it's pretty striking. What Congress decided was in the A section, it took a whole bunch of garden variety transactions, selling things, providing services, et cetera, and it said they are prohibited unless the affirmative defense of one of these 20 exemptions that set forth in 408 applies. The argument that you just articulated, drawn to its logical conclusion, would mean that it doesn't matter how unreasonable. You may think that the facts of this case are close, or you may not like our facts. We want to be put to our proof on this. But imagine a case where the compensation is I'm charging $5,000 an hour for my services. Under your reasoning, it wouldn't trigger the prohibited transaction rules and there would be no remedy under ERISA. But how do you reconcile that with the text of 406A1D, and particularly the prepositional clause, for the benefit of? How can the clause for the benefit of the party, how can that mean anything other than for the subjective intent of the party in interest? I mean, I think the short answer is anytime you take someone else's asset and you invest it so that you have a profit stake in it, you're using it for your benefit. That doesn't mean it's wrong. That means that it gets scrutinized for reasonableness. And in the mine run of cases, you can have a trial over whether or not this is a reasonable contract and the terms are reasonable, and you get to that issue. I don't see why you would grant summary judgment on some knowledge element before you get to that point. Counsel, the clock seems to be running fast this morning, and I'd like to get to the fiduciary status issue. And my question is, if a participant is free to withdraw from the fund without charge or penalty, what difference does it make whether the plan offers a comparable investment option? So I'm not sure that that's a critical point, but there's an antecedent point that I think is essential, which is the participant's ability to exit must be legally irrelevant. As the district court recognized, Great West has no case that has ever held that a participant's ability to move its money bears on fiduciary status, and there's a very simple reason for this. The purpose of ERISA is to protect retirement savings through fiduciary oversight, not through self-policing. If the ability of participants in a self-directed 401k plan to just move into a different investment negated fiduciary status, then no service provider that ever selected the investment options in a plan, that selected the terms of the investments, would ever have any responsibilities, because you could just say, well, I put a Ponzi scheme in the plan, but participants could have chosen to move their money, you know, and put it in another investment. There's a reason. Well, counsel, I understand that argument, and you've made it in your brief, but let's say we disagree with that, and we're back to whether having a comparable option is relevant. Is it? I mean, look, I think the much stronger argument is participant choice should be irrelevant, but if this court were to be the first circuit court to say it isn't. Well, let's say we are. How about answering my question? I will. I apologize. Then I think it needs to be meaningful choice. And if the, as is undisputed on this record, the Great West contract requires that there's no money market, that there's no other stable value product, that there's nothing similar, I think it's not really a meaningful choice to say the participants. All right. So if we would be the first, I take it you don't have any authority to support this argument, then? Oh, I think the strongest authority is the statute itself and 404C. I mean, 404C. All right. Fair enough. But no case authority. No. I don't think there are any cases. All of the cases are about the plan's ability to exit. And I will just say briefly on that one, the district court ignored a mountain of record evidence on that. Could I just ask you one thing about that? Let's say there is a restriction on the plan's ability to exit, maybe because of the 12-month issue. Why should that matter in this case when we don't have a plan who is a plaintiff in the case? Well, so it's not just the 12 months. Okay. But you don't have a plan that's a plaintiff in the case. So what difference does it make if there's a restriction on a plan exiting the fund? Okay. So the answer to that is if plans don't have the right to exit freely, then Great West has the control. The fact that Mr. Teeth's plan didn't try to exit doesn't bear on the question of whether Great West essentially can force the interest rate. I see that my time is up. Will you indulge me in a question? Going back to your non-fiduciary claim, the argument below for summary judgment was that you're not seeking equitable relief. That was the only argument on that issue. And the district court actually granted summary judgment on a different basis. Yes, it was funded. Aren't they right? You're not asking for equitable relief because you have not identified a specific fund here. No. That argument's wrong twice over. First, we have — Well, why don't you explain that? Okay. So first, we have a disgorgement claim that doesn't work in terms of you don't need to identify a specific fund. If that were the case, Solomon couldn't have come out the way it did. But we have an alternative equitable restitution claim. And this was the whole dialogue that, you know, that I had with the Court in the Montanil case. There's a difference between tracing something that's commingled and tracing something that's dissipated. So what the Supreme Court held in Montanil is that if you take assets and you commingle them. But in Montanil, there was first an identified fund that you could have a constructive trust on. And that identified fund was commingled. You're missing the first step here. You don't have an identified fund. But it's a different remedy. See, Montanil was — the remedy in Montanil was an equitable lien by assignment. And in the — under the treatises, one of the elements of an equitable lien is that you need to have a specifically identifiable fund because it's a contract remedy. That's not this case. This is an equitable restitution case. Totally different set of rules. If you look at Sereboff, the Court breaks down the difference. In an equitable restitution case, you just have to show that money that does not belong in good conscience to the wrongdoer can be — needs to be restored and can be traced. The premise of that argument is grafting an element onto this remedy that does not exist. And if I — if we were to disagree with you, you would — you would agree that that would eliminate your non-fiduciary claim because you have to not — you have to be seeking equitable. Oh, certainly. If — if — if discouragement doesn't fit here or if equitable restitution doesn't fit, then we can't state a claim under 502A3. That's — that's the core teachings of the Court. Okay. Okay. Thank you. Thank you, counsel. We'll add 2 minutes, 30 seconds. I appreciate that, Your Honor. You've already got extra time. Thank you so much. Good morning, Your Honors, and may it please the Court. Carter Phillips for the appellee in this case. I think I want to start with the question, Judge Bachrach, that you asked about, which is what — what is the nature of the scienter requirement? And I agree with you completely. You can derive it directly from the statute. 401A1D, for the benefit of, seems almost clearly to — to require that. And I don't see any other way to read Solomon other than to say that when you're talking about a non-fiduciary, so you're making an extraordinary leap here. You're imposing liability on somebody who's just dealing with the plan, providing services, to say that you're going to impose liability on them under those circumstances. You have to have more than simply the fact that they're — that this plan could be subjected to a challenge. That's what fiduciaries have to worry about. That's their job. Non-fiduciaries don't have that responsibility. And my good friend, I'm pretty sure, said not one word about scienter in this case in terms of any shred of evidence that we had any idea that there was a problem here. And it would be hard to just — hard to imagine that in a record in which we literally have thousands of these plans that we have entered into with fiduciaries all over the — all over the country. Mr. Phillips, let me ask you this, that I understand what Mr. — what your adversary just conceded. But text — let's go back to the text of 406A1D, and I'm wondering why textually does the prepositional clause, for the benefit of a party in interest, why is that necessarily a part of the use clause? For example, if you look — if you just read the sentence, it says constitutes a direct or indirect use by or for the benefit of a party in interest. Well, use by, it doesn't make any sense to say use by for the benefit of. The only way to read that is to say use by a party in interest. So the way I would naturally read the clause is that if the party in interest — or if the — if Great West is allowed to use the plan assets for any reason, then that is a per se violation of A1D. Or if you allow a third party to use the plan assets for the benefit of Great West. But here, if Great West actually was allowed to use the plan assets to invest for whatever reason, even for the benefit of the participants, I wonder why you would have the subjective intent requirement. Well, the reason you'd have a subjective intent requirement is because the whole purpose of this exercise is to put money into Great West's hands in order to end up with a guaranteed benefit product that is absolutely critical to the underlying fund and to a very huge segment of the fund. That's the reason why these assets are put into their hands. As it turns out, the way this deal is struck, they can then also commingle those funds with others and thereby come up with a profit, hopefully. Although, again, they bear the entire risk of that, right? If the market goes in the opposite direction, we're still on the hook for all principal and every nickel of the credited rate that we've promised to them. And so to suggest in that context that this statute's aimed at this kind of a situation is, to my mind, not what Congress had in mind. I mean, there'd be no reason to have enacted an entire provision to protect guaranteed benefit products. And then allow this to come in and essentially wipe them out in one fell swoop. So I don't think that's what — I don't think that's the right reading of it. But Solomon, I think, says absolutely clear that there's a fundamental difference between fiduciaries and non-fiduciaries. And when you're dealing with a non-fiduciary, then you have a science of requirement. You have to know that what the fiduciary is doing is illegal. And, again, there is not a shred of evidence on that score. And then, Judge McHugh, you asked about the remedial aspects of this. And, again, my good friend ignores the fundamental difference between a fiduciary and a non-fiduciary. Concepts like equitable restitution and disgorgement, those are the things that fiduciaries are held responsible for because they have a much higher duty. When you're in a world where you're trying to impose liability onto a non-fiduciary under these circumstances, you then have to come up with something other than a request for money out of the entire pot of the insurance assets. And that's all they're asking for. I mean, this is as classic a legal relief as you can get. You can dress it up all you want as disgorgement, but it's not disgorgement in the classic equitable sense. And at that stage, if you're doing that, you have got to have a race, specifically when you're dealing with a non-fiduciary. And so, you know, glossing over that, you know, is simply not going to get you home. With respect, Judge Matheson, you asked about more about the question of voting with their feet and what's the relevance of that. In the Department of Labor, and we cite this in the brief at page 25, note five, specifically identifies the idea that the participants can, when the participants have an election, that affects the analysis to some extent. You would expect that that makes sense. I mean, we're talking about somebody essentially walking into fiduciary responsibilities unknowingly, and therefore you would hope that that wouldn't be all that easy to achieve. And so the Department of Labor has looked at it. If the participants can vote and walk with their feet, that's relevant. It's not necessarily dispositive, but it's certainly relevant. If you've got a situation where the plan, I mean, the fund can walk away, and we know that in 3,000 instances during the class period, that is precisely what happened. And when you know that that's what's happened, then it's clear that we're not exercising unilateral discretion at all. We have no ultimate control or authority over anything. What about the one-year period that you can hold all of the funds in the plan, in the stable value fund? Even if the plan has indicated we're dropping this. Right. Judge Martinez nailed that one. Because what he said was, maybe if I had some evidence on this, that might be an issue. But there's not a shred of evidence that any plan either had that imposed on them, indicated any fear of having that imposed on them. I mean, the plaintiffs had more than a year of discovery before the summary judgment motions. They made no effort. Well, counsel, assuming for the sake of argument that at least having that hammer, the potential ability to restrict, matters, does the fact that there isn't a plan that is a plaintiff in this proceeding make that irrelevant? Well, no, I think what makes it relevant is that we don't even have any evidence. Well, no, I understand. I mean, this plan never tried to get out. I just find it interesting there's not a plan. All the plaintiffs are participants, correct? Yes. All right. There isn't a plan, and yet the argument they're making is that a restriction on the exit of a plan is what makes Great West a fiduciary. Right. That would make Great West a fiduciary to the plan, would it? Also make it a fiduciary to the participants? Yeah, I think the answer would be yes. But this is why you have to look at what authority the plan still retains after we make, frankly, our offer. And what we know is that, in contrast, candidly, to a lot of the district court decisions that have recognized the importance of these guaranteed benefit plans for these funds, where there have actually been some, I wouldn't say draconian, but certainly some penalties for making moves. And they've all been upheld. And when you shift that and you look at this plan, which all you have is a contractual right that so far as we know has never been exercised and so far as we know has never influenced a single fund sponsor in making any kind of a decision, it seems to me I could win on either of these grounds. Either the participants have the authority to take away our control and authority or the plan or the fund sponsors have that ability. So what about this argument about the participants that the claim is that the Great West has somehow, in setting up the relationship with the plans, has restricted the ability of the participants to move into a comparable fund? Why doesn't that make Great West a fiduciary? Well, again, that's an abstract concept. There's not a single shred of it. Mr. Tietz never wanted to get out of the fund. He never testified that he was ever deterred from getting out of the fund. There's no evidence from any other plaintiff that anybody ever had any problem with respect to that issue. I mean, it's just an abstract proposition out there. And what we do know, let me just make one really quick point. In the situation where the plan shifts, okay, so the plan says we're going to use different providers, immediately there will be a new stable value fund included as part of that change. And every one of the participants at that point can immediately change over to that fund. Twelve months later. What's that? No, no, no. Twelve months later. No, no, no. Well, let me ask you. They can shift immediately. Well, the only thing that matters is getting money back. There's not another stable fund in the options. Well, but then that would have been the plan. That's the fund sponsor's decision under those circumstances. But typically, the vast majority of these have some kind of a stable fund option. But the reason we don't know about this is because none of this was raised as a factual matter in the proceedings before the disclosure. You go ahead, Scott. Go ahead, I'm sorry. Well, I'm almost wrapped up this line. But wasn't there at least some evidence that Great West did limit the plans in so far as the options? Yes. No question about that. We have that in our – it's not in the contract in this particular case, but it is clearly our practice to do that. All right. So I want to follow up on Judge Matheson's question. So if, in light of Mr. McLeod's testimony, in light of the questionnaire, if a fact finder could reasonably infer that a participant in this plan could not reasonably change his or her options to another stable guarantee fund or a CD, they would have to go and change their contributions to a riskier fund. As a practical matter, couldn't a fact finder reasonably conclude, for purposes of summary judgment, that Great West did have – I'll ask it two ways – did have discretionary power over the participants' options by limiting the participants' options to move their funds, to vote with their feet, to change their money into a comparable plan? I would have two answers to that. The first one is, again, there's no evidence whatsoever. I don't know – it would be pure speculation by a trier of fact in the absence of some participant saying at some point in some testimony that this actually made a difference as opposed to simply that there is a fact of a relationship between the plans – or, excuse me, the funds and Great West. But second, even if it were true that you wanted to discount the participants' involvement in this, it would still remain the case that the funds' ability to move out of this is more than enough to take us out of that. Well, how realistic really is that when you announce the accredited rate two days before the quarter? And there's really no obligation that you even do it then, is there? I mean, the habit has been – Right, but the record on summary judgment is that that's what we did. That was what the district court found. Two days before the quarter starts, the accredited rate is announced, and the plan fiduciary looks at that and says, that's outrageous. We're getting out. They don't have a reasonable amount of time to bring in another plan, and you can delay the transfer of the funds from the Great West Stable Value Fund into any new plan for up to 12 months. I mean, is that really enough ability to vote with your feet? Well, it's a fact that 3,000 of these funds, in fact, did that over the course of the class period, and the plaintiffs didn't bother to ask any of them whether there was a problem with the two days, whether there was a problem with the one year. I don't think you can just take an unexercised, so far as we know, contract provision and say, you've got all this experience, you're doing this on a class-wide basis involving 17,000 funds, and we have not a shred of evidence that anything was ever a problem. And the only evidence that we do have is that there was a consistent pattern of voting with their feet. And under those circumstances, the judge did exactly the right thing. Well, when you say 3,000 other plans were able to do this, Mr. McCloud did acknowledge that they had made exceptions to this no competitor policy. So I don't know, in any or all of those 3,000 plans that withdrew from the fund, whether or not they had the option to go into another stable fund that Farmers Rice did not. But the reality is that the competition, again, if they wanted to litigate these issues, we would have a much fuller record on this. But the reality is that there are literally thousands and thousands of these plans out there. They compete aggressively. It's not a surprise that the funds switch periodically, because there's somebody showing up at their doorstep saying, we can give you a better deal, we can give you a better deal. And so it is, again, we didn't litigate it, so I don't know the answer to it, but I would be stunned if you were to tell me that some fund could not find a plan that would provide a stable value component to it, because almost, as far as I know, every, and if you read the Chamber of Commerce brief and the American Benefits Council, they go to great lengths to describe just how attractive this particular set of investment opportunities are and how largely ubiquitous they are. Which, again, you know, it's worth stepping back for two seconds to say, you know, Congress passed a provision to make sure that insurance companies could have these plans in place. And the plaintiffs are basically saying to you, look, we want to blow them up. We want to either blow them up under functional fiduciary standards or we want to blow them up under the interest of party standard. And it seems to me absolutely inconsistent with what Congress wanted, and it is absolutely inconsistent with what is in the best interest of the ERISA participants and, frankly, for the ERISA funds. Could I just ask a clarification question? Do you agree with the district court that the GBP exemption isn't relevant to Great West fiduciary status in this case? I agree that it's not dispositive of anything in this particular case. I do think it is helpful to recognize that we are, in fact, a guaranteed benefit plan within the meaning of that statute, because, again, it goes to the point I just made, which is Congress intended, Congress really wanted for these plans to be available because of the value that they give, particularly as I get older, it becomes much more important to me personally, that they guarantee, you know, all of the guarantees that are embedded in it and the willingness of the insurance companies to guarantee and to take all of the risk. That's a plan, you know, so it's relevant to that extent, but otherwise I agree it's not, it won't get us home. I do have a question on the party and interest claim, and it goes back to what Judge McHugh was asking Mr. Stris, and that is, even though it's really not been an appellate issue in this case, the fact that Judge Martinez granted summary judgment in effect on ground sua sponte, how can we uphold a summary judgment ruling on anything, on the party and interest claim, other than the lack of an equitable remedy, for example, your A1D argument? Now, you made that in district court, but only in response to the plaintiff's motion for partial summary judgment, and even there you didn't ask for summary judgment for Great West in responding, and in your motion for summary judgment, you did not make that argument, nor did you argue that on your motion for summary judgment, that the compensation as a matter of law was reasonable. You made these arguments in responding to the plaintiff's motion for summary judgment, so how can we say we're going to affirm the summary judgment because the plaintiff failed to muster evidence to respond to something that wasn't even presented? Well, at the end of the day, the question in the case is, is Scienter a requirement? Why? Why is that an issue when you did not raise that in your motion for summary judgment? I'd have to go back and look at it. I thought we put that issue into this case. We certainly quoted Solomon. You sure did, in responding to the plaintiff's motion for partial summary judgment. Well, but under those circumstances, the district court's free if the issue is posed, and the district court concludes that at the end of the day, the legal issue fully resolves the case. He can convert it over under those circumstances. He has discretion to do that. But you've reconciled it with Celotex. I mean, under Celotex, a claimant no longer has a burden, doesn't have a burden to muster evidence, unless the movement for summary judgment has put something at issue. But it would be, and it was an issue in our response to theirs. That's right. You know, if they had evidence of Scienter, they would have put it forward under those circumstances. And when he saw that there was no evidence, he realized this is a fundamental requirement. And so that's the first one. And then, of course, the second one is the remedial. There is no basis for an equitable remedy in this case. This is purely what the courts of law were for once upon a time. Okay. Thank you, Your Honor. Thank you, counsel. Well, if we're going to do equal time today, Mr. Stris, you've got a minute and 48 seconds. Oh, so he didn't go over? No, he did not. He did go over by 1 minute and 48 seconds. Do we owe Mr. Stris some time? Go ahead, Mr. Stris. So I really appreciate that, Your Honor, because I have one thing I want to say very quickly, which is about the evidence on fiduciary control. I just want to make sure that this is very clear, because I think it's important. The only way a plan could veto this interest rate is by freezing the fund or terminating the contract. Here's the evidence that's in the record, because if we're going to lose, I want to lose on the actual record. Either one of those things triggers the 12-month waiting period. That's at page 129 of the appendix. Freezing requires 90 days' written notice before the waiting period kicks in. This is section 5.4 at page 124 of the appendix. So that means if Great West says the interest rate is zero, even if I freeze the contract, I'm stuck with zero for 90 days. Terminating requires 60 days' written notice. This is section 13.1 at page 132 of the appendix, and triggers a contract termination charge. That's at page 131 of the appendix, section 7.9. We pointed all of these things out to the district court. So there's a reason why the district court relied on participants voting with their feet, because on the plan voting issue, they just lose on the record. So I just don't want Mr. Phillips, my friend Mr. Phillips, to be able to say, well, I win under either one, because I just don't think he gets to summary judgment on those fat questions about the plan's ability to avoid the interest rate. And then the other thing quickly on the non-fiduciary claim, in terms of the remedy judgment queue, Solomon was a non-fiduciary case. I just want to be very clear on this as well. Solomon was a party in interest, and the remedy they talked about was disgorgement. And so I would point your attention to page 251 of the opinion, where the ---- You have to look at the restatement on equity when you're dealing with ERISA. Right. But there are different remedies. In other words, when we argued Montagnier, we represented a participant, and the claim that was being brought against us was not one for disgorgement. It was one for an equitable lien by agreement under the contract. And if you look at the treatises, they have different elements. For the disgorgement claim, the elements are listed on page 251 of the Supreme Court's decision, and it says nothing about tracing or an identifiable fund. I think that's why Judge Martinez ran from that argument and tried to find another basis for his decision. Thank you, counsel. Thank you. Thank you to both counsel. We appreciate your arguments this morning. They're very helpful. And the case will be submitted, and counsel are excused.